# Exhibit 1

FILED
02-28-2017
John Barrett
Clerk of Circuit Court
2017CV001661
Honorable Clare L.
Fiorenza-03
Branch 03

**State of Wisconsin**          **Circuit Court**          **Milwaukee County**

LAURA VAN HEIJNINGEN
805 S. Barclay Street
Milwaukee, WI 53204
    &
TOM VAN HEIJNINGEN
3127 N. Newhall Street
Milwaukee, WI 53211

                        Plaintiffs,

          v.          Case No.

                          Case Code: 30303– Contracts

30 WATT HOLDINGS, INC.
600 Washington Ave N #203
Minneapolis, MN 55401
    &
RYAN DOLAN
4201 Christy Lane
Minnetonka, MI 55345

                    Defendants.

## SUMMONS

STATE OF WISCONSIN

To each person named above as a Defendant:

     You are hereby notified that the Plaintiffs named above has filed a lawsuit or other legal action against you. The Complaint, which is attached, states the nature and basis of the legal action.

     Within twenty (20) days of receiving this Summons, which is increased to forty-five (45) if you are the State of Wisconsin, an agency, an officer, employee, or agent of the State of Wisconsin, an insurance company, or if any cause of action included herein is founded in tort or sixty (60) days if you are the United States of America you must respond with a written answer, as that term is used in Chapter 802 of the Wisconsin Statutes, to the Complaint. The Court may reject or disregard

an answer that does not follow the requirements of the Statutes. The answer must be sent or delivered to the Court whose address is: Milwaukee County Courthouse, 901 N. 9th Street, Milwaukee WI, 53233 and to Adams Law Group, LLC, Plaintiffs' attorney, whose address is: 1200 E. Capitol Drive, Suite 360, Milwaukee, WI 53211, and telephone number (414)-921-1945. You may have an attorney help or represent you.

If you do not provide a proper answer within twenty (20) days, (45 days if you are the State or Wisconsin or an insurance company, or if any cause of action included herein is founded in tort, 60 days if you are the United States of America) the Court may grant judgment against you for the award of money or other legal action requested in the Complaint; and you may lose your right to object to anything that is or may be incorrect in the Complaint, A judgment may be enforced as provided by law. A judgment awarding money may become a lien against any real estate you own now or in the future and may also be enforced by garnishment or seizure of property.

Dated February 28, 2017.

ADAMS LAW GROUP, LLC

By:_____

Daniel M. Adams
WisBar# 1067564

Attorney for Plaintiff
1200 E. Capitol Drive, Suite 360
Milwaukee, WI 53211
(414)-921-1945
Dan@DefenseWisconsin.com

FILED
02-28-2017
John Barrett
Clerk of Circuit Court
2017CV001661
Honorable Clare L.
Fiorenza-03
Branch 03

**State of Wisconsin**          **Circuit Court**          **Milwaukee County**

LAURA VAN HEIJNINGEN
805 S. Barclay Street
Milwaukee, WI 53204
    &
TOM VAN HEIJNINGEN
3127 N. Newhall Street
Milwaukee, WI 53211

          Plaintiffs,

      v.                                          Case No.

                              Case Code: 30303– Contracts

30 WATT HOLDINGS, INC.
600 Washington Ave N #203
Minneapolis, MN 55401
    &
RYAN DOLAN
4201 Christy Lane
Minnetonka, MI 55345

          Defendants.

---

## COMPLAINT

---

NOW COMES the above-named Plaintiffs, LAURA VAN HEIJNINGEN and TOM VAN HEIJNINGEN by their attorney, Daniel M. Adams of the Adams Law Group, LLC and as and for his complaint against the Defendants, 30 WATT HOLDINGS, INC. and RYAN DOLAN, hereby alleges as follows:

## PARTIES

1. The Plaintiff, LAURA VAN HEIJNINGEN is an adult Wisconsin resident who resides at 805 South Barclay, City of Milwaukee, County of Milwaukee, WI, 53204. The Plaintiff TOM VAN HEIJNINGEN is an adult Wisconsin resident who resides at 3127 N Newhall Street, City of Milwaukee, County of Milwaukee, WI, 53211.

2. The Defendant, 30 WATT HOLDINGS, INC. (herein "30 Watt Holdings"), is a domestic corporation registered in the State of Minnesota, with principal offices located at 600 Washington Ave N #203, Minneapolis, MN 55401

3. The Defendant, RYAN DOLAN, is an adult Minnesota resident who resides at 4201 Christy Lane, Minnetonka, MN 55345.

4. Upon information and belief, Defendant Dolan is an owner of Defendant 30 Watt Holdings, Inc.

## JURISDICTION AND VENUE

5. This Complaint pertains to a domestic Limited Liability Company, DW Pub LLC (herein "the Company"), registered with the Wisconsin Department of Financial Institutions and in accordance with Wisconsin law. The Company was created with the sole purpose to own and operate a small bar and restaurant doing business as "Drink Wisconsinbly Pub & Grub (herein "the Restaurant").

6. The Company has a registered agent office of 135 E. National Avenue, Milwaukee, Wisconsin, 53204. This address is the physical location of the Restaurant.

7. The Company is governed by an Operating Agreement (herein "Operating Agreement") entered into by Plaintiffs and Defendant, 30 Watt Holdings. Defendant Dolan entered into the agreement on behalf of Defendant 30 Watt Holdings. A true and correct copy of the Operating Agreement has been attached as "Exhibit A."

8. The Operating Agreement specifies that it "shall be governed by, interpreted, and enforced under the laws of Wisconsin..." (Ex. A at 11.1).

9. The Operating Agreement designates Defendant Dolan as the Chief Manager of the Company. The Operating Agreement describes this position as the "general active manager of the Company's business." (Ex. A at 5.3).

10. All of the Company's business activities occur at the Restaurant located at 135 E. National Avenue, City and County of Milwaukee Wisconsin, 53204.

2

## GENERAL ALLEGATIONS

11. Upon information and belief, between October 2015 and November 2015, Plaintiffs met with Defendant Dolan to discuss partnering on a casual bar-restaurant project for the 135 E. National Avenue property.

12. The Plaintiffs had previously engaged in an extensive rehabilitation of 135 E. National Avenue, and thereafter, operated a fine dining restaurant at the property. Despite glowing reviews, the fine dining restaurant was forced to close due to financial hardships stemming from the extensive rehabilitation of the property.

13. Defendant Dolan and Plaintiffs discussed the idea of partnering together on a new, casual concept restaurant for the 135 W. National Avenue property. Defendants would provide needed working capital and provide the concept based upon their "Drink Wisconsinbly" brand. The Company would be operated for the mutual benefit of Plaintiffs and Defendant 30 Watt Holdings.

14. Defendant 30 Watt Holdings is an internet-based novelty tee-shirt and schlock merchant. The "Drink Wisconsinbly" is one of 30 Watt Holdings' numerous brands. The Restaurant is Defendant 30 Watt Holdings only known bar or restaurant venture.

15. Plaintiff Laura van Heijningen is a restaurant industry veteran and ran a top thirty restaurant for two years prior to the partnership. She organized the Restaurant's launch, including hiring key staff, creating the menu, promoting the restaurant's opening, and working as a front of house manager.

16. Plaintiff Tom van Heijningen was instrumental in negotiating the Company's lease to be able to use the Restaurant's property. He also built out the new Restaurant for its opening.

17. The Parties memorialized their Company's governance, management, and ownership structure in the Operating Agreement. The Operating Agreement provided for, among other terms, the following:

   a. The Company's Members are limited to Plaintiffs and Defendant 30 Watt Holdings.

   b. Ownership of the Company is vested in its Members: Defendant 30 Watt Holdings (50% ownership interest), Plaintiff Laura van Heijningen (25% ownership interest), and Tom van Heijningen (25% ownership interest). (Ex. A at Schedule A)

   c. Defendant Dolan was named the company's Chief Manager. (Ex. A at 5.3).

3

d. Plaintiff Laura van Heijningen was named the Company's Treasurer. (Ex. A at 5.4).

e. Certain ownership and management decisions require a "Super Majority" (80% or more of the percentage interest held by members) vote prior to approval. (Ex. A at 1.16). These decisions include:

    i. Whether to accept contributions and how to value contributions. (Ex. A at 3.1, 3.2, 6.3(d)).

    ii. Whether to make distributions to members. (Ex. A at 4.3, 4.7).

    iii. Whether to remove manager(s) with or without cause. (Ex. A at 5.6).

    iv. Whether to modify the amount or character of the capital contributions (Ex. A at 6.3(d)).

    v. Whether to amend the articles of organization or the Operating Agreement. (Ex. A at 6.3(g)).

    vi. Whether to authorize of any single transaction in excess of $5,000. (Ex. A at 6.3(h)).

18. The Operating Agreement also allows for judicial dissolution pursuant to Chapter 183 of the Wisconsin State Statutes.

19. As an inducement to enter into business together, Defendants agreed that Defendant 30 Watt Holdings would contribute $25,000.00 to the Company in return for 50% of the Company's ownership. This contribution is reflected in the Operating Agreement (Ex. A at Schedule A).

20. The Plaintiffs' contribution for equity in the form of a turnkey operation that included equipment and inventory already held at the property. Furthermore, in consideration, the Plaintiffs contributed their ability to lease the restaurant property, the goodwill they had acquired with their previous fine dining operation at the property, and their labor and knowledge in launching the Restaurant.

21. Despite the signed and executed Operating Agreement, Defendant Dolan began managing the Company and Restaurant as if it was a sole proprietorship and to the detriment of Plaintiffs, to wit:

    a. On or about the month of February of 2016, Dolan announced that the Company would pay 30 Watt Holdings a prohibitive licensing fee for the right to use the "Drinking Wisconsinbly" brand. Upon information and belief, these fees were in the amount of $4,000 per month.

4

b. On or about the month of February of 2016, Dolan announced that his $25,000 contribution to the Company was actually a loan that should be paid back to Dolan with interest.

c. On or about the month of March of 2016, Dolan announced that Laura van Heijningen would no longer be working at the Company and barred her from entering the Restaurant.

d. On about the month of October of 2016, Dolan changed the locks to the Restaurant. After being confronted, Dolan temporarily provided Plaintiffs with a key to the Restaurant before changing the locks a second and final time.

e. On or about the month of November 2016, Dolan changed the Point of Sale (POS) system that takes and records payments to the Company thereby stripping Plaintiffs' ability to monitor the Company's revenue.

f. Beginning on or about the month of August 2016 and continuing through the month of February 2017, Dolan and his agents, have repeatedly refused Plaintiffs the ability to fully access the accounting records of the Company.

22. At the time of this Complaint's filing, Plaintiffs have been literally and figuratively locked out of the Company. Plaintiffs have no ability to monitor the premise, inspect the full accounting records, or access whether debt or other encumbrances are being made for the Company.

23. Plaintiffs, through the limited access to the incomplete accounting records provided by Defendants have learned of significant irregularities in the recorded income of the Company. According to a certified public accountant hired for the purpose of inspecting the accounting records, the Company is reporting a lower than industry standard profit margin on food, alcohol, and merchandise sales. Additionally, the accounting records show far larger costs than industry standards for labor and accounting services. The sum of the discrepancies between the industry standards and that reported by the Company's limited accounting records is approximately $231,038.17.

24. Upon information and belief, Plaintiffs believe Defendants have improperly taken in upwards of $21,212.86 in so-called "license fees" over the past 12 months from the Company.

25. Furthermore, based upon Dolan's unilateral decisions to treat his $25,000 contribution as a loan to be repaid and to pay himself a prohibitive license fee for his "Drink Wisconsinbly" brand, Dolan has engaged in significant self-dealing at the expense of the Company and Plaintiffs.

5

26. Upon information and belief, Plaintiffs believe that the sum of Defendants' actions have resulted in damages to Plaintiffs in the approximate amount of $136,731.95, which is half of the sum of all discrepancies between food, alcohol, labor, and accounting services' costs and the entirety of the improper license fees.

## CLAIM I: BREACH OF CONTRACT

27. Reallege and incorporate, as if fully set forth herein, the foregoing paragraphs of the Complaint.

28. Defendants mutually assented to and agreed to the contract to form the Company with the sole benefit of operating a bar and restaurant for mutual benefit of the Defendant 30 Watt Holdings and Plaintiff.

29. The attached Operating Agreement was the contract agreed to by the Parties.

30. Plaintiffs performed all of their obligations under the contract, except for those obligations for which it was excused, by providing Defendants consideration in the form of inventory and goodwill contributions, the ability to lease the Restaurant property, and labor in starting up and operating the Restaurant.

31. Defendants breached the contract with Plaintiffs by not abiding by the terms of the Operating Agreement and by self-dealing in the form of taking monies from the Company for Defendants' exclusive benefit.

32. Plaintiffs were injured in an amount to be proven at trial, but Plaintiffs' believe this amount is approximately $136,731.95.

## CLAIM II: BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

33. Reallege and incorporate, as if fully set forth herein, the foregoing paragraphs of the Complaint.

34. Defendants mutually assented to and agreed to the contract to form the Company with the sole benefit of operating a bar and restaurant for mutual benefit of the Defendant 30 Watt Holdings and Plaintiffs.

35. Defendants owed Plaintiffs a duty of good faith and fair dealing.

36. Defendants breached their duty to Plaintiffs by not abiding by the terms of the Operating Agreement and by self-dealing in the form of taking monies from the Company for the Defendants' exclusive benefit.

37. Plaintiffs were injured in an amount to be proven at trial, but Plaintiffs' believe this amount is approximately $136,731.95.

6

## CLAIM III: BREACH OF FIDUCIARY DUTY

38. Reallege and incorporate, as if fully set forth herein, the foregoing paragraphs of the Complaint.

39. Defendants mutually assented to form the Company with the sole benefit of operating a bar and restaurant for mutual benefit of the Defendant 30 Watt Holdings and Plaintiffs.

40. The Company was formed with Defendant 30 Watt Holdings and Plaintiffs as the sole Members.

41. Defendants owed Plaintiffs the fiduciary duties of good faith, fair dealing, and/or loyalty.

42. Defendants' breached their duties to Plaintiffs by not abiding by the terms of the Operating Agreement and by self-dealing in the form of taking monies from the Company for the Defendants' exclusive benefit.

43. Plaintiffs were injured in an amount to be proven at trial, but Plaintiffs' believe this amount is approximately $136,731.95.

## CLAIM IV: ACCOUNTING

44. Reallege and incorporate, as if fully set forth herein, the foregoing paragraphs of the Complaint.

45. On February 22, 2016, Plaintiffs and Defendant 30 Watt Holdings entered into an agreement to form the Company for the purpose of operating a bar and restaurant at 135 E. National Avenue, Milwaukee, WI.

46. The Company was begun at that date with Defendant Dolan managing and conducting the Company's business.

47. Thereafter on or about the month of July of 2016, Dolan unilaterally broke the Operating Agreement and has locked out his partners, Plaintiffs.

48. Defendants, though often requested so to do, have failed to render to Plaintiffs an account and statement of the Company's transactions.

49. Upon information and belief, profits have been realized by the Company and not disclosed to Plaintiffs.

50. Further upon information and belief, Defendants have made distributions from the Company that not been disclosed to Plaintiffs.

7

51. Plaintiffs' believe they are owed their portion of profits from the Company, which will be shown through a full and true accounting.

## CLAIM V: JUDICIAL DISSOLUTION

52. Reallege and incorporate, as if fully set forth herein, the foregoing paragraphs of the Complaint.

53. On February 22 2016, Plaintiffs and Defendant 30 Watt Holdings entered into an agreement to form the Company for the purpose of operating a bar and restaurant at 135 E. National Avenue, Milwaukee, WI.

54. The Company was begun at that date with Defendant Dolan managing and conducting the Company's business.

55. Thereafter on or about the month of July of 2016, Dolan unilaterally broke the Operating Agreement and has locked out the Company's Members, the Plaintiffs.

56. Thereafter on or about the month of August of 2016, Dolan has continuously broken the Operating Agreement by unilaterally modifying the character and value of capital contributions, making distributions, removing Plaintiff Laura van Heijningen as a Company Treasurer, and upon information and belief, making transactions in amounts exceeding $5,000.

57. Further, Defendants have taken exclusive possession of the full accounting records and have prevented Plaintiffs from having access to them.

58. Defendants, as Plaintiffs are informed and believes, have during the existence of the Company, drawn from the firm various large amounts of money, including "license fees" that are in amounts and quantities unknown to Plaintiffs, without making entry on the books of the Company or properly charging them to himself.

59. Defendants, as Plaintiffs are informed and believes, have neglected the affairs of the Company and have squandered much of the moneys and goodwill invested in the Company without consulting with Plaintiffs.

60. A judicial dissolution is the only recourse for Plaintiffs as Defendant 30 Watt Holdings' 50% blocks any Super Majority approval of a contractual dissolution.

8

WHEREFORE, Plaintiffs, respectfully request that the Court enter judgment against the Defendants and award the following:

## DAMAGES

1. Defendants breach of the contract, good faith and fair dealing and/or fiduciary duty, resulted in general damages that include the improper distributions made by Defendants, in an amount of approximately $136,731.95.

## FURTHER REMEDIES

2. That Defendants be ordered and compelled to account with the Plaintiffs as to all the dealings of the Company, the amounts received as well for capital paid, as for all receipts of the business, all business transactions as to which an accounting should be had, all sums drawn out by Defendants and their agents, all investments of capital, all money due or to become due to the Company and all its other assets.

3. That Defendants be ordered to pay over to the Plaintiffs as Plaintiff's share of the assets, the sum of $136,731.95 or the sum or property found due or justly belonging to the Plaintiffs on premises.

4. That the Company be dissolved.

5. That the Defendants be ordered to participate in an orderly wind up of the business and properly divide its assets.

6. For the costs and disbursements of this action, and,

7. For other or further relief that may be equitable.

TRIAL BY A JURY OF 12 PERSONS OF ALL CLAIMS PROPERLY TRIABLE TO A JURY IS HEREBY REQUESTED.

Respectfully Submitted, at Milwaukee, Wisconsin, this 28th day of February 2017:

ADAMS LAW GROUP, LLC
For the Defendant

By: _____
Daniel M. Adams
State Bar No. 1067564
735 W. Wisconsin Ave., Suite 725
Milwaukee, WI 53233
(T) 414-921-1945
(F) 414-921-1946
Dan@DefenseWisconsin.com

9

## OPERATING AGREEMENT
## OF DW Pub LLC
## Manager Managed

This Operating Agreement (Agreement) is made on December 1, 2015, among the Members as listed in Schedule A (the "Members"). The undersigned are all of the members of DW Pub, LLC, a Wisconsin limited liability company.

## ARTICLE I
## DEFINITIONS

For this Agreement, the following words have the following meanings:

1.1 "Act" means the Wisconsin Limited Liability Company Act, Wis.. Stat. Ch. 181, as amended from time to time.

1.2 "Agreement" means this Operating Agreement, as amended from time to time, including any Schedules to it.

1.3 "Capital Account" means the capital account of a member established and maintained in accordance with Section 3.3.

1.4 "Code" means the Internal Revenue Code of 1986, as amended, and any successor thereto. Any reference to specific Sections of the Code is deemed to include a reference to any corresponding provisions of future law.

1.5 "Company" means DW Pub, LLC, a Wisconsin limited liability company.

1.6 "Contribution" means the total amount of money or the value accorded by the members to property or services contributed (or to be contributed) by a Member as a capital contribution to the Company.

1.7 "Distribution" means the distributions to the Members of cash or other assets of the Company made from time to time under this Agreement.

1.8 "Estimated Member Tax Liability" means the taxable income and gains of the Company as reported on the Company's federal partnership tax return for the fiscal year.

1.9 "Majority in Interest" means any Member or group of Members holding an aggregate of more than 50% of the Percentage Interests held by all Members.

1.10 "Membership Unit or Unit" means one of the units of a Member's ownership interest in the Company.

1.11 "Net Profits" and "Net Losses" mean that the profits and losses of the Company as determined for federal income tax purposes as of the close of each of the fiscal years of the Company.

1

## EXHIBIT A

1.12 "Manager" means a person elected, appointed, or otherwise designated as a manager by the members.

1.13 "Percentage Interest" means the percentage of ownership interest each Member has in the Company, reflected on Schedule A attached to this Agreement, calculated as the number of Membership Units held by such Member, divided by all issued and outstanding Membership Units.

1.14 "Regulations" means the Treasury Regulations, including temporary Treasury Regulations, promulgated under the Code, as from time to time in effect.

1.15 "Substitute Member" means an assignee of all or part of a Member's Membership Units that becomes a Member in place of a Transferor in accordance with Article X.

1.16 "SuperMajority in Interest" means any Member or group of Members holding an aggregate of 80% or more of the Percentage Interests held by all Members.

## ARTICLE II
## BUSINESS PURPOSES AND OFFICES

2.1 **Name; Business Purpose.** The name of the Company is stated in the Articles. The business purpose of the Company is to operate a bar and restaurant. The Company is formed only for such business purpose and will not be deemed to create any agreement among the Members with respect to any other activities whatsoever other than the activities within such business purpose.

2.2 **Powers.** In addition to the powers and privileges conferred upon the Company by law, the Company has the same powers as a natural person to do all things necessary or convenient to carry out its business and affairs.

2.3 **Principal Office.** The principal office of the Company will be located at 135 East National Avenue, Milwaukee, Wisconsin.

2.4 **Registered Office and Registered Agent.** The registered office of the company is 135 East National Avenue, Milwaukee, Wisconsin. The registered agent of the company is Laura van Heijningen.

2.5 **Ratification of Certain Acts.** The Company and each initial Member ratify all actions taken before the Company had at least one Member.

## ARTICLE III
## CONTRIBUTIONS AND CAPITAL ACCOUNTS; TERMS OF UNITS

3.1 **Capital Contributions.** The names of the Members, their respective Contributions and the agreed value, and the number of their Membership Units received by the Members in exchange for their Contributions are reflected on Schedule A. Upon the issuance of additional Membership Units, Schedule A shall be amended to reflect such

2

issuance. The value of a member's contribution shall be determined by the approval of a vote of the SuperMajority in Interest of the Members.

**3.2   Additional Capital Contributions.** Additional Members may be admitted to the Company and additional Membership Units may be issued upon approval of a vote of the SuperMajority in Interest of the Members. Whenever any additional Member is admitted to the Company, or any additional Membership Units are issued, the Percentage Interest of each Member outstanding immediately prior to such admission or issuance will be decreased proportionally, as appropriate, to maintain the aggregate Percentage Interests of the Members at 100%. Schedule A will be amended to reflect any adjustment in the Percentage Interests of the Members in accordance with this Section. No Member will have any preemptive right to make an investment in the Company with respect to an additional contribution by reason of such Member's ownership of Membership Units in the Company. No Member is obligated to make any Additional Contributions to the Company and, accordingly, no Member will be liable for damage to the Company or any other Member as a result of the failure of such Member to make any Additional Contributions. No creditor of the Company shall rely upon or enforce an agreement to make a capital contribution to the Company.

**3.3   Capital Accounts.** A separate Capital Account shall be maintained by the Company for each Member. The Capital Account for each Member shall be increased by the Member's Contribution and shall be decreased by Distributions made to the Member. Each Member's Capital Account shall also be increased or decreased to account for allocations of Net Profit and Net Losses to such Member. As of the date on which additional Contributions are made by any Member or Distributions are made in liquidation of any Membership Units, the Capital Account balances of the Members may be restated to reflect the fair market values of the Company's properties as of such date and the manner in which Net Profit and Net Losses would have been allocated had the Company disposed of its properties on such date. Any Member who receives a Membership Interest with a transfer of all or part of the Membership Interest of another Member, shall have a Capital Account which reflects the Capital Account of transferred interest.

  i   Notwithstanding any provisions in this Agreement to the contrary, the Members intend that each Member's Capital Account shall be maintained and adjusted in accordance with the Code and the Regulations.

  ii   If, in the opinion of the Company's certified public accountants, the manner in which Capital Accounts are to be maintained under this Article should be modified to comply with Code and Regulations then not withstanding anything to the contrary, the method in which Capital Accounts are maintained shall be so modified; provided, however, that any such change shall not materially alter the economic agreement between and among the Members.

**3.4   No Right to Return of Contribution.** No Member shall have the right to withdraw or to demand the return of all or any part of his Contribution. The Company shall not be liable to the Members for repayment of their Contributions.

3

**3.5    No Interest on Contributions.** No interest shall be paid to any Member on Contributions, unless otherwise agreed in writing.

**3.6    Non-assessable.** No Member shall be required to make any Contributions over the amount stated in Schedule A, nor shall any Member have any obligation to fund, advance, or loan monies which may be necessary to pay any deficits incurred by the Company. Any payment or transfer accepted by the Company from a Member which is not a Contribution permitted by this Agreement shall be deemed a loan and shall neither be treated as a contribution to the capital of the Company for any purpose, nor entitle such Member to any increase in such Member's Percentage Interest.

**3.7    Terms of Membership Units.** The Membership Units reflected in Schedule A are ordinary membership units of one class, without series, and shall have the rights provided by law, subject to any statement in this Agreement of the specific rights or terms of such Membership Units.

## ARTICLE IV
## ALLOCATION OF NET PROFIT
## AND NET LOSSES; DISTRIBUTIONS

**4.1    Allocations of Net Profit and Net Losses.** Net Profit and Net Losses shall be allocated to the Members pro rata based on their Percentage Interests in accordance with Regulations and the Code.

**4.2    IRS Section 704(c) Allocation.** To the extent required by Section 704(c) of the Code, items of income, gain, loss, or deduction regarding contributed properties shall be allocated among the Members in such manner as considers any variations between the basis of such properties to the Company upon contribution and the fair market values of such properties at the time of contribution.

**4.3    Distributions Prior to Liquidation.** The Members shall determine from time to time whether to make any Distributions to the Members by an affirmative vote of a SuperMajority in Interest of the Members. Such Distributions shall be made among the Members in proportion to their Membership Units.

**4.4    Distributions upon Dissolution and Winding Up.** At the time of the dissolution and winding up of the Company, following the allocation of all Net Profit and Net Losses and the payment of all Company obligations, the remaining assets shall be distributed to the Members in accordance with any positive balances in their respective Capital Accounts.

**4.5    No Distribution for Withdrawal.** Withdrawal from the Company or transfer of Membership Units shall entitle no Member to receive any Distribution from the Company except as Distributions to all Members are subsequently made under Sections 4.3 or 4.4.

4

**4.6     Distributions in Kind.** No Member shall have any right to demand or receive a Distribution from the Company in any form other than cash, nor shall any Member be compelled to accept any distribution of property in kind except where all Members receive undivided interests in property or substantially equivalent interests in property on the basis of their Membership Units. If a Distribution of property in kind occurs, such property shall be assumed to have been sold at its fair market value at the time of the Distribution, and the resulting gain or loss shall be allocated among the Members according to their Membership Units, and their Capital Accounts shall be adjusted accordingly.

**4.7     TAX DISTRIBUTIONS.** Because the Company has elected to be classified as a partnership for both federal and state income tax purposes, the Company will not make any deposits of state or federal withholding taxes or any contributions with respect to amounts paid to the Members under the Federal Insurance Contributions Act. The Members desire that the Company make to them Tax Distributions in order to provide the Members the cash necessary to pay taxes and tax estimates, in amounts sufficient to avoid the imposition of penalties by federal and state taxing authorities for Member's Estimated Member Tax Liability.

The Company may, in the discretion of a SuperMajority in Interest of the Members, make Tax Distributions to its Members on or before April 1, June 1, September 1 and December 1 of each Fiscal Year and, for each Fiscal Year on April 1 of the following Fiscal Year. The amount of the Tax Distributions shall be determined by the Members in their sole discretion, but shall be in an amount reasonably calculated to ensure that each member shall be able to make all tax payments, including quarterly estimated tax payments on the Estimated Member Tax Liability, in amounts equal to the lowest amount required to be paid by an individual pursuant to Code § 6654 and any appropriate state tax statutes to avoid the assessment of any penalty.

**4.8     Effect of Assignment on Allocation of Net Profit, Net Losses and Distributions.** Net Profit and Net Losses allocable to any Membership Units transferred or assigned during a year shall be allocated between the assignor and assignee based upon the time during any fiscal year of the Company, as measured by the effective date of the assignment, that the Membership Units were owned by each of them, or, in the discretion of the Members, based upon a cutoff of the Company books as of the effective date of the assignment. All Distributions after the effective date of the assignment shall be made to the assignee. The agreement between assignor and assignee should consider the extent that such Distributions may be attributable to the results of operations during the time the Membership Units were owned by the assignor.

**ARTICLE V**
**MANAGEMENT**

**5.1     Management.** The management of the Company shall be vested in managers, as defined in section 182.0401 of the Act.

5

**5.2    Number and Designation.** The Company must have one or more natural persons exercising the functions of the position of Chief Manager and Treasurer. The Members may elect or appoint such other managers as it deems necessary for the operation and management of the Company, with such powers, rights, duties and responsibilities as may be determined by the Members, each of whom has the powers, rights, duties and responsibilities set forth in this operating agreement unless otherwise determined by the Members. Any of the positions or functions of those positions may be held by the same person.

**5.3    Chief Manager.** The Chief Manager (a) has general active management of the Company's business; (b) presides at all member meetings, when present; (c) sees that all orders and resolutions of the members are carried into effect; (d) may maintain records of and certify proceedings of the members; and (e) performs such other duties as may from time to time be prescribed by the members. The initial Chief Manager is Ryan Dolan.

**5.4    Treasurer.** The Treasurer (a) keeps accurate financial records for the Company; (b) deposits all monies, drafts, and checks in the name of and to the credit of the Company in such banks and depositories as the members may designate from time to time; (c) may endorse for deposit all notes, checks and drafts received by the Company as ordered by the members, making proper vouchers therefore; (d) disburses company funds and issue checks and drafts in the name of the Company, as ordered by the members; (e) must render to the Chief Manager and members, whenever requested, an account of all of such manager's transactions as Treasurer and of the Company's financial condition; and (f) performs such other duties as may be prescribed by the member or the Chief Manager from time to time. The initial Treasurer shall be Laura van Heijningen.

**5.5    Authority and Duties.** In addition to the foregoing authority and duties, all managers of the Company have such authority and perform such duties in the management of the Company's business as may be designated from time to time by the members. Unless prohibited by a resolution approved by the affirmative vote of a Majority in Interest of the members, an officer elected or appointed by the members may, without the approval of the members, delegate some or all of the duties and powers of a position to other persons.

**5.6    Term.** The first Chief Manager and Treasurer shall have a three-year term. Each successive manager of the Company holds office until his or her successor is chosen and has qualified, or until the manager's earlier death, resignation or removal. A manager may resign at any time by giving written notice to the Company. The resignation is effective without acceptance when the notice is given to the Company, unless a later effective date is specified in the notice. A manager may be removed at any time, with or without cause, by a resolution approved by the affirmative vote of a SuperMajority in Interest of the members. A vacancy in a position because of death, resignation, removal, disqualification or other cause may, or in the case of a vacancy in the position of Chief

6

Manager or Treasurer shall, be filled for the unexpired portion of the term by the members.

## ARTICLE VI
## MEMBERS

6.1 **Place of Meetings.** Each meeting of the members will be held at the principal executive office of the Company or at such other place as may be designated by the Members.

6.2 **Regular Meetings.** Regular meetings of the members may be held on an annual or other less frequent basis as determined by the Members; provided, however, that if a regular meeting has not been held during the immediately preceding 15 months, a member or members owning 10% or more of the voting power of all membership interests entitled to vote may demand a regular meeting of members by written demand given to the Chief Manager of the Company.

6.3 **Action by Members/Voting Requirement.**

i   Each Member has the right to vote in accordance with such Member's Percentage Interest. Except as otherwise expressly provided in this Agreement, the affirmative vote of a Majority in Interest is required for a valid decision of the Members.

ii  In addition to those matters specified elsewhere in this Agreement as requiring the approval of a Super-Majority in Interest, the affirmative vote of a Super-Majority in Interest is required for the following:

   a) the approval of a merger or consolidation or plan of exchange with another Person or the conversion to another type of entity or domestication to another domicile;

   b) change of the status of the Company from one in which management is vested in the managers to one in which management is vested in the Members;

   c) the sale, lease, exchange, or other disposition, other than by mortgage, deed of trust, or pledge, of all, or substantially all, the Property, with or without the goodwill of the Company;

   d) determination, modification, compromise or release of the amount and character of the contributions that a Member makes as the consideration for the issuance of an Interest;

   e) confession of a judgment on behalf of the Company;

   f) an assignment of the Property for the benefit of creditors of the Company;

   g) amending the articles of organization or this Agreement;

   h) authorization of any single transaction in excess of $5,000.

iii At any time that no Person has the right to vote or to participate in the management of the business and affairs of the Company with respect to the Interest held by such

7

Member, then the Percentage Interest represented by such Interest will be disregarded in determining whether the requisite percentage necessary for a valid decision of the Members has been obtained, with the effect that such Interest will be treated as if such Interest had not been issued and the requisite percentage necessary for a valid decision will be applied against the remaining Percentage Interests.

6.4 **Proxies.** A member may cast or authorize the casting of a vote by filing a signed and dated appointment of a proxy with a manager of the Company at or before the meeting at which the appointment is to be effective. The member may sign or authorize the written appointment of a proxy with an original signature or by authenticated electronic communication. Any copy, facsimile, or other reproduction of the authenticated electronic communication may be used in lieu of the original, provided that it is a complete and legible reproduction of the entire original.

6.5 **Quorum.** The owners of a super-majority in interest of the members are a quorum for the transaction of business. If a quorum is present or represented by proxy when a duly called or held meeting is convened, the members present may continue to transact business until adjournment, even though the withdrawal of members originally present leaves less than the proportion otherwise required for a quorum.

6.6 **Meeting By Remote Communication.** A member may participate in a regular or special meeting of the members by any means of remote communication through which the member, other members so participating by remote communication, and all members physically present at the meeting may simultaneously hear each other during the meeting. A member so participating is deemed present in person at the meeting.

6.7 **Action Without a Meeting.** Any action required or permitted to be taken at a meeting of the members of the Company may be taken without a meeting by written action signed by the members who own voting power equal to the voting power that would be required to take the action at a meeting. The written action is effective when signed by the required members, unless a different effective time is provided in the written action. When written action is permitted to be taken by less than all members, all members must be notified immediately of its text and effective date.

## ARTICLE VII
## LIABILITY

7.1 **No Personal Liability.** No Member or manager, solely by reason of being a Member or manager, will be liable, under a judgment, decree or order of a court, or in any other manner, for a debt, obligation or liability of the Company, whether arising in contract, tort or otherwise, or for the acts or omissions of any other Member, manager, agent, or employee of the Company.

7.2 **Limitation of Liability.** No Person will be liable to the Company or its Members for any loss, damage, liability, or expense on account of any action taken or omitted to be taken by such Person as a manager or member, other than for (i) breach of the duty of

8

loyalty; (ii) a financial benefit received by the Governor to which the Governor is not entitled; (iii) a breach of a duty under Section 183.0402 of the Act; (iv) intentional infliction of harm on the Company or a Member; or (v) an intentional violation of criminal law.

## ARTICLE VIII
## TAX MATTERS

**8.1    Tax Characterization and Returns.** The Members acknowledge that the Company will be treated as a partnership for tax purposes. Within 90 days after the end of each fiscal year, the Chief Manager or Treasurer of the Company will cause to be delivered to each person who was a Member during such fiscal year a Form K-1 and such other information regarding the Company as may be necessary for preparing such Member's federal or state income tax (or information) returns, including a statement showing each Member's share of income, gain, or loss and credits for such fiscal year for federal or state income tax purposes.

**8.2    Accounting Decisions.** All decisions as to accounting matters shall be made by the members in their sole discretion. The Company, at the sole discretion of the members, also may make or revoke such elections as allowed under the Code, including the election referred to in Section 754 of the Code to adjust the basis of Company property.

**8.3    Tax Matters Partner.** The members shall designate a Member to act for the Company as the "tax matters partner" within the meaning of Section 6231(a)(7) of the Code. The initial tax matters partner shall be Ryan Dolan.

## ARTICLE IX
## TRANSFERS AND REDEMPTIONS OF MEMBERSHIP UNITS

**9.1    General Restrictions.** Except as expressly provided in this Agreement, no Member may Transfer all or any part of such Member's Membership Units. Any purported Transfer of Membership Units in violation of the terms of this Agreement will be null and void and of no effect. A permitted Transfer will be effective as of the date specified in the instruments relating thereto. Any Transferee desiring to make a further Transfer will become subject to all of the provisions of this Article to the same extent and in the same manner as any Member desiring to make any Transfer.

**9.2    Permitted Transfers.** A Transferor may Transfer (but not substitute the assignee as a Substitute Member in such Member's place, except in accordance with Section 9.3), by a written instrument, all or any part of such Member's Membership Units, provided that the Transfer would not result in the "termination" of the Company pursuant to § 708 of the Code. Any assignee of Membership Units as allowed by this Section 9.2 who does not become a Substitute Member as provided in Section 9.3 (a "Transferee") (i) will not be a Member and will not have any right to vote as a Member or to participate in the management of the business and affairs of the Company, such right to vote such Membership Units and to participate in the management of the business and affairs of

9

the Company continuing with the Transferor and (ii) shall have only those rights accorded to an assignee as set forth in Section 183.0704 of the Act. The Transferee will, however, be entitled to distributions and allocations of the Company attributable to the Membership Units that are the subject of the Transfer to such Transferee.

### 9.3 Substitute Members.

i No assignee of all or part of a Member's Membership Units will become a Substitute Member unless and until:

   a) the Transferor (if living) has stated such intention in the instrument of assignment;

   b) the Transferee has executed an instrument accepting and adopting the terms and provisions of this Agreement;

   c) the Transferor or Transferee has paid all reasonable expenses of the Company in connection with the admission of the Transferee as a Substitute Member; and

   d) a SuperMajority in Interest of the Members, in their sole and absolute discretion, have consented in writing to such Transferee becoming a Substitute Member.

ii Upon satisfaction of all of the foregoing conditions with respect to a Transferee, the members will cause this Agreement to be duly amended to reflect the admission of the Transferee as a Substitute Member.

### 9.4 Effect of Admission as a Substitute Member.
Unless and until admitted as a Substitute Member pursuant to Section 9.3, a Transferee is not entitled to exercise any rights of a Member in the Company, including the right to vote, grant approvals or give consents with respect to such Membership Units, the right to require any information or accounting of the Company's business or the right to inspect the Company's books and records, but a Transferee will only be entitled to receive, to the extent of the Membership Units transferred to such Transferee, the distributions to which the Transferor would be entitled. A Transferee who has become a Substitute Member has, to the extent of the Membership Units transferred to such Transferee, all the rights and powers of the Member for whom such Transferee is substituted and is subject to the restrictions and liabilities of a Member under this Agreement and the Act. Upon admission of a Transferee as a Substitute Member, the Transferor will cease to be a Member of the Company to the extent of such Membership Units.

### 9.5 Redemption of Membership Units.
Any Membership Units may be redeemed by the Company, by purchase or otherwise, upon the consent of the holder of such Membership Units and approval by an affirmative vote of a SuperMajority in Interest of the members. Whenever any Membership Units are redeemed by the Company in accordance with this Section 9.5, the Percentage Interest of each Member outstanding immediately following such redemption will be increased proportionally, as appropriate, to maintain the aggregate Percentage Interests of the Members at 100%. The members

10

will cause Schedule A to be amended to reflect any adjustment in the Percentage Interests of the Members in accordance with this Section 9.5.

9.6 **No Dissociation.** A Member shall not cease to be a Member as a result of the bankruptcy of such Member or as a result of any events specified in Section 183.0802 of the Act. So long as a Member continues to hold any Membership Units, such Member shall not have the ability to withdraw or resign as a Member and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of the Company shall be null and void. As soon as any Person who is a Member ceases to hold any Membership Units, such Person shall no longer be a Member and shall be dissociated.

9.7 **Involuntary Withdrawal.**

i The following events ("Triggering Events") allow the Company to purchase all, but not less than all, a Member's Units, in accordance with this Section:

a) The death or incapacity due to a disability of a Member;

b) In connection with the divorce or dissolution of the marriage of the Member, any court issues a decree or order that transfers, awards, or confirms a Membership Interest, or any part thereof, to the Member's spouse;

c) The voluntary or involuntary bankruptcy, appointment of a receiver, liquidation, or assignment for the benefit of creditors of a Member;

d) If a Deadlock occurs and is not resolved within thirty days after the occurrence of the Deadlock, then any Member (the "Moving Member") may give the other Members (the "Non-Moving Members") a Notice allowing the Non-Moving Members to elect within twenty days to either Voluntarily Withdraw from the Company and to have all, but not less than all, of their Membership Financial Rights in the Company sold pursuant to this Section or have the Moving Member Voluntarily Withdraw from the Company and to have all, but not less than all, of his or her Membership Financial Rights in the Company sold pursuant to this Section. If the Non-Moving Members fail to make the election provided for by this section within twenty days after receipt of notice from the Moving Member, the Moving Member shall elect within twenty days to either Voluntarily Withdraw from the Company and to have all, but not less than all, of his Membership Interests in the Company sold or have the Non-Moving Members Voluntarily Withdraw from the Company and to have all, but not less than all, of their Membership Interests sold. If the Moving Member fails to affirmatively make the election provided for in this Section within the twenty day period, he shall be deemed to have elected to have the Non-Moving Members Voluntarily Withdraw from the Company and to have the Company purchase all, but not less than all, of the Non-Moving Members' Interests.

11

ii   Within 20 days of a Triggering Event, the Company will redeem all the Member's Interest in the Company for an amount equal to the Fair Value of the Company multiplied by the Percentage held by the Withdrawing Member. The Company shall pay the purchase price through delivery of a Promissory Note in an amount equal to the Purchase Price and payable over 5 years, with interest at the Prime Rate.

iii   Fair Value. The Fair Value of the Company shall initially mean and refer to value as set forth on the Schedule attached hereto as Exhibit B. The Members shall revise Exhibit B on or before July 1 of each year following the date of execution of this Agreement. If, upon the occurrence of a Triggering Event, the members do not unanimously agree that the Fair Market Value of the Company is as set forth on Exhibit B, the Fair Value of the Company shall be the Appraised Value of the Company. The Appraised Value shall be determined as follows:

a)   Within 20 days of a Triggering Event, the Company and the Withdrawing Member shall simultaneously submit their estimation of the value of the company in a sealed envelope to the accountants regularly employed by the Company. The accountants regularly employed by the Company shall open the sealed envelopes and examine the estimated valuations submitted only after they have received both valuations. If the highest estimated value submitted is equal to or less than one hundred ten percent (110%) of the lowest value submitted, the Fair Value shall be the average of the two estimated values. If the highest estimated value submitted is greater than one hundred ten percent (110%) of the lowest value submitted, the Appraised Value shall be through an appraisal as follows.

b)   The Company and the Withdrawing Member shall jointly select a qualified appraiser or appraisers, and such jointly selected appraiser or appraisers shall value the Company. If the parties cannot agree on the selection of a qualified appraiser or appraisers, then, within ten days after demand by either of them, each party shall appoint a qualified appraiser. If any party entitled to appoint an appraiser does not do so, then the appraiser appointed by the other party may act alone. The two appraisers so appointed shall, within ten days after the appointment of the second of them to be appointed, select a third appraiser. The appraiser or appraisers shall determine the value of the Company (including, in the event the appraisals are being conducted after the death of a Member, the value of the Gross Life Insurance Proceeds received or to be received as a result of the death of the Member) and submit their appraisals to the accountants regularly employed by the Company. The Appraised Value shall be the average of all such apprised values submitted by the appraisers. The cost of the appraisals shall be borne equally by the parties.

## ARTICLE X
## DISSOLUTION AND TERMINATION

## 10.1  Events Causing Dissolution.

12

i  The Company will be dissolved upon the first to occur of the following events:

    a) upon the approval of a Super-Majority in Interest; and

    b) upon the entry of a decree of judicial dissolution permitted under Section 183.0902 of the Act.

ii  Notwithstanding Section 183.0901 of the Act, the forgoing events which cause dissolution of the Company are the exclusive events which cause the dissolution of the Company.

**10.2   Effect of Dissolution.**  Except as otherwise provided in this Agreement, upon the dissolution of the Company, the members will take such actions as may be required pursuant to the Act and will proceed to wind up, liquidate and terminate the business and affairs of the Company.  In connection with such winding up, the members may liquidate and reduce to cash (to the extent necessary or appropriate) the assets of the Company as promptly as is consistent with obtaining fair market value therefore, apply and distribute the proceeds of such liquidation and any remaining assets in accordance with the provisions of Section 10.3, and do any and all acts and things authorized by, and in accordance with, the Act and other applicable laws for the purpose of winding up and liquidation.

**10.3   Application of Proceeds.**  Upon dissolution and liquidation of the Company, the assets of the Company will be applied and distributed in the order of priority set forth in Section 4.4.

**ARTICLE XI**
**MISCELLANEOUS**

**11.1   Governing Law.**  This Agreement shall be governed by, interpreted, and enforced under the laws of Wisconsin, without giving effect to its conflict of laws provisions.

**11.2   Articles of Organization.**  If any conflict arises between the Articles of Organization and this Agreement, this Agreement shall govern to the extent not contrary to law.

**11.3   Binding Effect; No Third-Party Beneficiaries.**  Except as otherwise provided to the contrary, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their personal representatives, heirs, successors, and assigns. None of the provisions contained in this Agreement are for the benefit of or enforceable by any third parties, including creditors of the Company; provided, however, the Company may enforce any rights granted to the Company under the Act, the Articles, or this Agreement.

**11.4   Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same instrument.

**11.5   Severability.**  All provisions of this Agreement are fully severable. If any provision is held to be illegal, invalid, or unenforceable under the present or future laws effective

13

during the term of this Agreement then this Agreement will be construed and enforced as if such provision had never comprised a part of this Agreement and the remaining provisions of this Agreement will remain in full force and effect. In lieu of such illegal, invalid, or unenforceable provision, there will be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid and enforceable.

**11.6    Additional Documents and Acts.** Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out, and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated.

**11.7    Notices.** Any notice, demand, or request required under this Agreement shall be given to party hereto in writing at the addresses set forth beneath the party's signature by personal service, by overnight service from a nationally-recognized courier, or by United States mail, certified with return receipt requested and postage prepaid. Notices, demands, or requests to a Member shall be sent to the Member's address specified in the Company's Required Records. Notices, demands or requests to the Company shall be sent to:

>DW Pub, LLC
>135 East National Avenue
>Milwaukee, Wisconsin

>With copies to:

>30 Watt Holdings, Inc.
>c/o Ryan Dolan
>600 Washington Ave N
>Suite 203
>Minneapolis, MN 55401

>And

>Rubric Legal LLC
>c/o Michael Frasier
>233 Park Ave S, Ste 205
>Minneapolis, MN 55415

A party may change its address for notice by delivering notice of the new address to the other parties as required above. Any notice, demand, or request shall be deemed received: (a) if sent by personal service, when such personal service is effected; (b) if sent by overnight service from a nationally-recognized courier, on the business day immediately following timely deposit with the courier; and (c) if sent by United States mail, 5 business days following deposit in the mail.

14

reflect all Company transactions and be appropriate and adequate for the Company's business. The books and records of the Company will be maintained at the principal office of the Company.

The Members have signed this Agreement on the date opposite their signatures.

**MEMBERS:**

Dated: 2/22/16

30 Watt Holdings, Inc.
600 Washington Ave. N. Suite 203
Minneapolis, MN 55401

Dated: 2-22-2016

Laura van Heijningen

Dated: 2/22/2016

Tom van Heijningen

16